**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

REBECCA KEITH,

      Plaintiff,

v.

COMMITTEE FOR CATHOLIC SECONDARY EDUCATION IN COLORADO SPRINGS, a Colorado Nonprofit Corporation d/b/a ST. MARY'S HIGH SCHOOL,

      Defendant.

## COMPLAINT

COMES NOW Plaintiff, Rebecca Keith, by and through her counsel, Cornish & Dell'Olio, P.C., and for her Complaint against Defendant Committee for Catholic Secondary Education in Colorado Springs d/b/a St. Mary's High School, states as follows:

### Introduction

1. This is an action brought against the Defendant pursuant to the Americans with Disabilities Act, 42 U.S.C. § 1210, *et seq.*

### Jurisdiction

2. Jurisdiction is proper in the U.S. District Court for the District of Colorado pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12117(a)

### Venue

3. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2) as the actions giving rise to this action occurred in the State of Colorado.

**Parties**

4. Rebecca Keith is a resident of Colorado Springs, CO who was employed by the Committee for Catholic Secondary Education in Colorado Springs d/b/a St. Mary's High School as a high school math and science teacher and Chair of the Math Department.

5. Committee for Catholic Secondary Education in Colorado Springs d/b/a St. Mary's High School (hereafter "St. Mary's") is a Colorado nonprofit corporation that operates a private Catholic high school in Colorado Springs, CO.

6. St. Mary's employs approximately 50 employees.

**Factual Allegations**

7. Paragraphs 1-6 are incorporated herein.

8. St. Mary's is a private Catholic high school in Colorado Springs, CO.

9. Rebecca Keith is a highly educated and experienced teacher.

10. Dr. Keith started her teaching career in August 2005.

11. St. Mary's hired Dr. Keith on August 16, 2011 as a math and science teacher.

12. In 2005, Dr. Keith received a Master of Science degree from the University of Colorado Boulder.

13. In 2006, Dr. Keith received a Master of Arts degree from the University of Colorado Colorado Springs.

14. In 2017, Dr. Keith received a Doctor of Philosophy degree from the University of Colorado Colorado Springs.

15. Throughout her employment with St. Mary's, Dr. Keith received satisfactory performance evaluations.

16. St. Mary's considered Dr. Keith to be a very good employee.

17. St. Mary's did not have any problems with Dr. Keith's work or teaching ability.

18. Throughout her employment, Dr. Keith performed the duties of her position satisfactorily.

19. During the 2017-2018 school year, Dr. Keith was employed as the Chair of the Math Department.

20. Dr. Keith suffers from CREST Syndrome.

21. CREST Syndrome is a rare auto-immune and multi-system connective tissue disorder. It is a form of systemic sclerosis.

22. When not properly treated, the CREST Syndrome causes Dr. Keith to suffer severe pain and to become easily fatigued.

23. Dr. Keith's symptoms can be exacerbated by environmental conditions such as heat, cold, or light.

24. In particular, Dr. Keith's symptoms are worsened by working in very hot or very cold classrooms, and by working under flickering or flashing lights.

25. The severe pain caused by the CREST Syndrome causes Dr. Keith to sometimes suffer from exhaustion or fatigue.

26. This exhaustion or fatigue caused by the CREST Syndrome sometimes caused Dr. Keith to suffer muscular spasms or tremors.

27. The muscular spasms or tremors have an appearance similar to seizures.

28. The muscular spasms or tremors are not seizures.

29. Dr. Keith has suffered from this disorder for many years; however, she was only formally diagnosed with CREST Syndrome after a visit to the Mayo Clinic in or around July 2017.

30. Prior to her visit to the Mayo Clinic in 2017, Dr. Keith had been misdiagnosed as suffering from other ailments.

31. During the time period that Dr. Keith was misdiagnosed, the treatment regime that she was prescribed exacerbated, rather than ameliorated, the symptoms she suffered.

32. After receiving the correct diagnosis, Dr. Keith worked with her doctors to adjust her medication and use other techniques to control the pain she suffered and to reduce the frequency and duration of the muscular tremors.

33. The CREST Syndrome limited Dr. Keith's mobility, and at times she used canes or a walker for support while walking.

34. At all times relevant to this Complaint, Dr. Keith's ability to walk was significantly less than the ability to walk of most people in the general population.

35. Limited mobility and the potential for fatigue make it difficult for Dr. Keith to navigate stairs or stand for long periods of time.

36. At all times relevant to this Complaint, Dr. Keith's ability to stand was significantly less than the ability to stand of most people in the general population.

37. At all times relevant to this Complaint, the operation of Dr. Keith's immune system was significantly impaired as compared to the immune systems of most people in the general population.

38. The CREST Syndrome substantially limits the major bodily function of Dr. Keith's immune system and substantially limits her in the major life activities of caring for herself, walking, and standing as compared to most people in the general population.

39. St. Mary's was aware of Dr. Keith's medical condition.

40. St. Mary's was aware of the impairments Dr. Keith suffered because of her medical condition.

41. St. Mary's became aware of Dr. Keith's medical condition during the 2015-2016 school year.

42. Employees of St. Mary's, including Dr. Keith's supervisor, observed Dr. Keith using canes or a walker to assist with her mobility.

43. At times during her employment, St. Mary's allowed Dr. Keith to take some Wednesdays off as an accommodation for her disability.

44. The ability to take some Wednesdays off allowed Dr. Keith to rest and recover from the fatigue caused by her disability.

45. Working every Wednesday was not an essential function of Dr. Keith's job.

46. Wednesdays are testing days, and Dr. Keith's absence on those days did not create any disruption to the school or students.

47. Allowing Dr. Keith to have some Wednesdays off did not create any hardship to St. Mary's.

48. Dr. Keith also occasionally requested, and was granted, permission to not attend assemblies or lunch duty.

49. Attending assemblies or lunch duty required Dr. Keith to navigate stairs, which contributed to her fatigue.

50. Attending assemblies was not an essential function of Dr. Keith's job.

51. Attending lunch duty was not an essential function of Dr. Keith's job.

52. Allowing Dr. Keith to occasionally miss an assembly or lunch duty did not create any disruption to the school or students.

53. Allowing Dr. Keith to occasionally miss an assembly or lunch duty did not create any hardship to St. Mary's.

54. Even while suffering from the symptoms of the CREST Syndrome, Dr. Keith was able to perform the essential functions of her position with or without a reasonable accommodation.

55. On November 14, 2017, Dr. Keith received a letter from David Hyland, St. Mary's principal, that states the following: "Effective immediately, you are placed on paid leave for the remainder of the semester . . . . Your status for second semester will be resolved in the coming weeks."

56. Dr. Keith did not request this leave of absence, and she desired to remain at work.

57. Dr. Keith suggested alternatives to a leave of absence to Mr. Hyland; however, he rejected her suggestions and kept Dr. Keith on leave and away from work.

58. On November 23, 2017, Mr. Hyland sent Dr. Keith an email that states: "I have placed you on a paid leave of absence. We have developed plans to cover your classes until you are ready to return to the classroom. When you are in recovery we can talk about a timetable for you to return to the classroom."

59. On November 30, 2017, Mr. Hyland sent Dr. Keith an email that states the following:

> On November 14, 2017, we notified you that we were placing you on a paid leave of absence for the remainder of the semester. You stated that you did not agree with our decision. You have also subsequently stated that this leave was 100% involuntary.
>
> While we greatly appreciate your service to St. Mary's, we have come to the conclusion that action was required. Over the last several months we have worked with you to accommodate your health situation. We have allowed you to have Wednesdays off. We have excused you from various events. We have worked so that you are not present for fire drills. Recently, we have also become aware of a resuscitation incident. Your seizures have gotten more frequent and your health is deteriorating. We do not know what additional accommodations are needed to prevent your seizures and improve your health. We have concluded that your seizures and its [sic] potential impacts pose a safety hazard to both you and your students. We need your doctor to tell us what accommodations are needed to prevent the seizures and improve your health.
>
> In order to assess your needed accommodations for a potential return at the start of second semester, your doctor needs to provide us with his recommended accommodations by December 8, 2017. When we receive the needed accommodates [sic] from your doctor, we will assess if we are able to provide these accommodates [sic]. If we can't meet the accommodations to eliminate your seizures and improve your health, your benefits package provides for short- and long-term disability, Family and Medical Leave Act (FMLA) leave, and life insurance. We suggest you do a benefits review. We are available to help you with the review and to help you apply for these programs.

60. Mr. Hyland's November 30, 2017 email contains a number of inaccuracies.

61. Mr. Hyland's November 30, 2017 email references a "resuscitation incident."

62. Dr. Keith has not been resuscitated.

63. Dr. Keith is entirely unaware of the alleged resuscitation incident referred to in the email.

64. In the November 30, 2017 email, Mr. Hyland makes a number of conclusory statements about Dr. Keith's health.

65. The conclusory statements about Dr. Keith's health that are set out in Mr. Hyland's November 30, 2017 email are not based on facts.

66. The conclusory statements about Dr. Keith's health that are set out in Mr. Hyland's November 30, 2017 email are not based on medical information.

67. The conclusory statements about Dr. Keith's health that are set out in Mr. Hyland's November 30, 2017 email are based on Mr. Hyland's prejudices about people with disabilities in general and Dr. Keith in particular.

68. Mr. Hyland's November 30, 2017 email also states that Dr. Keith's health was deteriorating. That statement is false.

69. As of November 30, 2017, Dr. Keith's misdiagnosis had been discovered and she had been properly diagnosed with CREST Syndrome.

70. After being diagnosed with CREST Syndrome, Dr. Keith was able to correctly treat her illness and her health improved.

71. In his November 30, 2017 email, Mr. Hyland also concluded that Dr. Keith posed a direct threat to herself and others.

72. Mr. Hyland is a Catholic High School Principal.

73. Prior to becoming the Principal of St. Mary's, Mr. Hyland worked at St. Mary's as a Vice Principal, Assistant Principal, class scheduler, and math teacher.

74. Mr. Hyland is not qualified to conclude that Dr. Keith posed a direct threat to herself or others.

75. Mr. Hyland is not a medical professional.

76. Mr. Hyland has no medical knowledge that would enable him to determine that Dr. Keith posed a direct threat to herself or others.

77. Mr. Hyland did not consider any objective evidence in reaching the conclusion that Dr. Keith posed a direct threat to herself or others.

78. Mr. Hyland's November 30, 2017 email also repeatedly states that Dr. Keith was suffering seizures and implies that Dr. Keith lost consciousness during those alleged seizures.

79. Mr. Hyland's statement that Dr. Keith was suffering from seizures, and the implication that she lost consciousness during those alleged seizures, is false.

80. Mr. Hyland's erroneous statement that Dr. Keith was suffering from seizures that caused her to lose consciousness is based on his stereotypes and prejudices about individuals with disabilities.

81. In response to Mr. Hyland's email, Dr. Keith hired a lawyer to communicate with St. Mary's about her rights under the Americans with Disabilities Act, as well as her desire to engage in an interactive process under the ADA.

82. On December 1, 2017, Dr. Keith's lawyer sent a letter to Mr. Hyland that informed him of Dr. Keith's desire to engage in the interactive process required by the ADA.

83. The December 1, 2017 letter stated that Dr. Keith was ready to return to teaching and requested that she be permitted to resume working.

84. St. Mary's refused Dr. Keith's request to allow her to return to work.

85. The December 1, 2017 letter also requested some very simple accommodations for Dr. Keith, including providing her with a classroom with adequate climate control, overhead lights that do not flicker, having the janitor clean Dr. Keith's classroom so she could avoid the

additional physical strain associated with cleaning, and a possible adjustment of the brightness of the flashing light on the fire alarm in her classroom.

86. St. Mary's rejected Dr. Keith's requests for accommodations that were made in the December 1, 2017 letter.

87. On December 19, 2017, Dr. Keith received a letter from her doctor containing the information St. Mary's had requested in prior emails from Mr. Hyland about Dr. Keith's medical condition, her ability to perform the essential functions of her job, whether she posed a threat to herself or others, and her need for reasonable accommodations. That letter from Dr. Keith's doctor was provided to St. Mary's on December 21, 2017.

88. The letter from Dr. Keith's medical provider to Mr. Hyland indicates that the treatment she was receiving had positively impacted Dr. Keith's physical mobility and reduced the number of seizure-like incidents from 3-4 per day to less than 1-2 per week.

89. The letter from Dr. Keith's medical provider expresses the opinion that with continued treatment, the seizure-like episodes would soon end altogether.

90. Dr. Keith's medical provider also recommended that she could return to her duties as a teacher immediately with only minimal accommodations.

91. As Dr. Keith had suffered an adverse reaction to the flashing light on the fire alarm in her classroom and St. Mary's had refused Dr. Keith's request to adjust the brightness of that light, Dr. Keith, on her own and at her own expense, obtained polarized glasses that filtered the light flashes from the fire alarm and should have eliminated any potential reactions to the light.

92. Dr. Keith's medical provider also reiterated the request to have the school custodian clean Dr. Keith's classroom in order to permit Dr. Keith to avoid the additional physical strain associated with cleaning.

93. Dr. Keith's medical provider concluded that Dr. Keith could return to work as a teacher with minimal accommodations.

94. Dr. Keith's medical provider also concluded that Dr. Keith posed no threat to herself, the students, or her coworkers.

95. After receiving the letter from Dr. Keith's medical provider that outlined the recommended accommodations for Dr. Keith and released her to return to work, St. Mary's determined that Dr. Keith needed more accommodations than what had been proposed by Dr. Keith's medical provider.

96. Mr. Hyland made the determination that Dr. Keith's disability was having a greater effect on her than its actual impact.

97. Mr. Hyland was not qualified to make the determination that Dr. Keith's disability was having a greater effect on her than its actual impact.

98. After St. Mary's received the letter from Dr. Keith's medical provider releasing her to return to work and acting on its belief that Dr. Keith needed more accommodations than those proposed by her doctor, St. Mary's requested that Dr. Keith attend a meeting on January 8, 2018 to continue the interactive process and reasonable accommodation identification.

99. Dr. Keith attended the January 8, 2018 meeting and answered a great deal of questions from St. Mary's lawyer about her condition and the potential accommodations she needed.

100. In the meeting, Dr. Keith reiterated that she needed the accommodations suggested by her doctor—the polarized glasses and to have the school's custodian clean her classroom.

101. In the January 8, 2018 meeting, Dr. Keith also requested the following accommodations: (a) that she not be required to supervise lunches as that would require her to negotiate stairs, and (b) that she be provided with fans or an air conditioner to keep her classroom from becoming unbearably hot during warmer months.

102. None of the accommodations Dr. Keith requested would result in any significant cost to St. Mary's.

103. St. Mary's could have provided Dr. Keith with all the requested accommodations without it creating any undue hardship.

104. At the conclusion of the January 8, 2018 meeting, St. Mary's refused to return Dr. Keith to work.

105. Instead of returning Dr. Keith to work, St. Mary's stated that it needed additional time to determine what course of action it would take with respect to returning her to work.

106. On January 25, 2018, St. Mary's sent Dr. Keith a letter informing her that it would not return to her to work as a teacher.

107. In that January 25, 2018 letter, St. Mary's stated that it would not return Dr. Keith to her position as a teacher because it "concluded that it cannot accommodate" her "return to work as a full-time teacher." That statement is false.

108. Prior to putting Dr. Keith on forced administrative leave, St. Mary's had been accommodating her by not requiring her to supervise student lunches. Accordingly, St. Mary's could provide that reasonable accommodation.

109. Prior to putting Dr. Keith on forced administrative leave, St. Mary's had a full-time custodian whose duties include cleaning her classroom. St. Mary's could have instructed that custodian to resume cleaning her classroom in order to provide her with that reasonable accommodation.

110. St. Mary's could have provided Dr. Keith with any other accommodations she requested.

111. The accommodations Dr. Keith requested were reasonable.

112. The accommodations Dr. Keith requested would have enabled her to perform the essential functions of her job.

113. St. Mary's refused to provide Dr. Keith with the requested accommodations.

114. St. Mary's left Dr. Keith on administrative leave until her contract expired.

115. St. Mary's refused to renew Dr. Keith's contract as a full-time teacher.

116. St. Mary's refused to renew Dr. Keith's contract as a full-time teacher because of her request for accommodations.

117. St. Mary's refused to renew Dr. Keith's contract as a full-time teacher because of her disability.

118. Dr. Keith's employment ended on May 25, 2018 when St. Mary's allowed her contract to expire.

119. If St. Mary's had provided Dr. Keith with the reasonable accommodations she requested, Dr. Keith would have returned to work in January 2018 and her contract would have been renewed for the 2018-2019 school year.

120. But for Dr. Keith's disability and request for accommodation, her contract would have been renewed.

121. St. Mary's failure to provide Dr. Keith with a reasonable accommodation resulted in the termination of her employment.

122. The discrimination that Dr. Keith has been subjected to has caused her to suffer a great deal of emotional distress and economic loss.

**First Claim for Relief (Americans with Disabilities Act- Disability Discrimination)**

123. Plaintiff realleges all prior paragraphs and incorporate them herein.

124. Dr. Keith is a qualified individual with a disability or alternatively has a record of a disability or is regarded as having a disability.

125. Dr. Keith was fully qualified for her position.

126. Dr. Keith was able to perform the essential functions of her job with or without a reasonable accommodation.

127. Dr. Keith requested a reasonable accommodation of her disability.

128. Defendant refused to provide Dr. Keith with a reasonable accommodation at any time after her request for a reasonable accommodation.

129. Defendant terminated Dr. Keith's employment because she requested a reasonable accommodation of her disability.

130. Defendant's acts and omissions violated Dr. Keith's rights under the Americans with Disabilities Act, 42 U.S.C. § 12112.

131. Dr. Keith has suffered damages, including lost wages and compensatory damages, emotional distress, reputational injuries, and has incurred attorneys' fees and costs as a result of Defendant's discriminatory conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1. A declaration that Defendant discriminated against Plaintiff in violation of the Americans with Disabilities;
2. Backpay in an amount equal to lost compensation and benefits;
3. Damages for all other monetary losses sustained as a direct result of the violations;
4. Non-pecuniary and compensatory damages, including damages for humiliation, emotional distress, and consequential damages;
5. Reinstatement or front pay in lieu thereof;
6. Punitive damages to the extent allowed by law;
7. Nominal damages;
8. Pre- and post- judgment interest at the highest statutory rate;
9. Costs and attorneys' fees; and
10. All other legal or equitable relief the court deems appropriate.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial for all issues triable by jury.

Respectfully submitted this 4th day of September, 2019.

                                                    CORNISH & DELL'OLIO, P.C.

                                                    s/Ian D. Kalmanowitz
                                                    Ian D. Kalmanowitz, # 32379
                                                    Cornish & Dell'Olio, P.C.
                                                    431 N. Cascade Ave. Suite 1
                                                    Colorado Springs, CO 80903
                                                    719-475-1204
                                                    719-475-1264 (fax)
                                                    ikalmanowitz@cornishanddellolio.com
                                                    Attorneys for Plaintiff

Plaintiff's address:
3106 Brenner Place
Colorado Springs, CO 80917

16